**CAMBRIDGE CREDIT COUNSELING CORP., Plaintiff,**

**v.**

**Nola FOULSTON, in her capacity as District, Attorney of the Eighteenth Judicial District of Kansas, Defendant.**

No. CIV.A.02–1273–JTM.

United States District Court,
D. Kansas.

Sept. 25, 2003.

David John Clark, Epstein, Becker & Green, PC, New York, NY, Jason E. Pepe, Michael B. Buser, Shook, Hardy & Bacon L.L.P., Kansas City, MO, Paul M Kaplan, Epstein, Becker & Green, PC, New York, NY, Ron Bodinson, Shook, Hardy & Bacon L.L.P., Overland Park, KS, for Plaintiff.

Frank E. White, Jr., Office of District Attorney, Wichita, KS, for Defendant.

### MEMORANDUM AND ORDER

MARTEN, District Judge.

This matter comes before the court on the plaintiff's motion for summary judgment (Dkt. No. 23) and the defendant's motion for summary judgment (Dkt. No. 21) in this case challenging K.S.A. § 21–4402 (the "debt adjusting law"). Both the plaintiff's and defendant's summary judgment motions are fully briefed and ripe for determination. For the reasons set forth below, the court grants the defendant's motion. Accordingly, this declaratory judgment action is dismissed.

### I. Background

The plaintiff brings this declaratory action, pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 2201, seeking a determination that the debt adjusting law is unconstitutional on its face and when applied to the plaintiff. The debt adjusting law, states:

(a) Debt adjusting is engaging in the business of making contracts, express or implied, with a debtor whereby the debtor agrees to pay a certain amount of money periodically to the person engaging in the debt adjusting business who shall for a consideration distribute the same among certain specified creditors.

(b) The provisions of this act shall not apply to those situations involving debt adjusting, as defined here, which is incidental to the lawful practice of law in this state.

(c) Debt adjusting is a class B nonperson misdemeanor.

Specifically, the plaintiff seeks an order from the court declaring the debt adjusting law unconstitutional, directing the defendant to refrain from taking any action prohibiting the plaintiff from providing services to Kansas residents in exchange for contractual fees, and preventing the defendant from enforcing the debt adjusting law against the plaintiff. The plaintiff brings this action following notice from the defendant of her concern that the defendant may be acting in violation of the debt adjusting law.

Both parties agree and admit to the court's jurisdiction over this matter; they agree that venue is proper in this district. The parties agree that there are no genuine issues of material fact in this matter. They agree that disposition of this case via summary judgment motions is proper if so determined by the court.

## II. Statement of facts

The parties stipulate to the following facts:

1. Plaintiff, Cambridge Credit, is a not-for-profit corporation, as defined by § 501(c)(3) of the Internal Revenue Code, and incorporated in Massachusetts. It is in the debt adjusting and credit counseling business. Its principal place of business is Agawam, Massachusetts.

2. Cambridge Credit does not have currently, and has never had any offices, telephone listings, employees or agents physically located in the State of Kansas.

3. Cambridge Credit does not own or maintain currently, and never has owned or maintained any bank accounts, money or real property in the State of Kansas.

4. Cambridge Credit manages the credit card and other unsecured debts of individuals by entering into contracts to act as an intermediary between the individuals and their respective creditors to renegotiate the terms of the consumers' credit card and other unsecured debts.

5. Cambridge Credit attempts to provide a benefit to consumers who have fallen behind on making payments to creditors. Cambridge Credit attempts to reduce the customers' debt by, among other things, arranging with their creditors for lower interest rates. At the same time, Cambridge Credit attempts to benefit the creditors by structuring a plan whereby individuals may resume regular payments and avoid bankruptcy.

6. Cambridge Credit has the economic ability to negotiate with creditors on behalf of its clients in seeking to obtain forgiveness of certain indebtedness, waiver of certain liabilities and late fees, and reduction or elimination of interest rates.

7. Cambridge Credit advertises its services via national cable television advertisement and radio advertisements (the "Advertisements") that air in Kansas, as well as in most other states throughout the United States.

8. Cambridge Credit maintains an internet website ("Website") and places advertisements in magazines that are distributed nationally, *e.g. Sports Illustrated, TV Guide, Good Housekeeping* and *Cosmopolitan* ("Magazines").

9. Cambridge Credit serves over 180,-000 clients and works with over 15,000 creditors nationwide. It currently employs approximately 260 people in Agawam, Massachusetts.

10. Cambridge Credit currently serves over 800 active clients in Kansas. The net income Cambridge Credit received from its clients in Kansas in 2001 was approximately $87,000.

11. Cambridge Credit collects its fees under the following fee structure. When new clients first enter into a contract with Cambridge Credit, they pay it a one-time initial fee that is equal to one of their total monthly payments to all creditors. The clients then make monthly payments to Cambridge Credit, which disburses 90% of the payments to the clients' creditors and retains the other 10% of those monthly payments for itself. Once the creditors receive this money, they generally pay a "Fair Share" percentage (typically approximately 6%) back to Cambridge Credit. Cambridge Credit, through its "Good Payer Program," rebates 50% of the "Fair Share" payments back to its clients who

make proper and timely payments over a requisite six-month period.

12. Since 1996, Cambridge Credit has disbursed over $6,600,000 to its clients through its "Good Payer Program."

13. Competitors of Cambridge Credit doing business in Kansas, who are not attorneys, provide services similar to those provided by Cambridge Credit, for which they charge fees and also retain all "Fair Share" payments received from creditors.

14. All contacts and interaction between the employees of Cambridge Credit and the Kansas clients of Cambridge Credit occurs via long-distance telephone calls, facsimiles, the United States mail, common carrier delivery services (ie: Federal Express, United Parcel Services) and internet electronic mail.

15. Defendant, Nola Tedesco Foulston, is the District Attorney of the Eighteenth Judicial District of Kansas. Her offices are located at the Sedgwick County Courthouse, 535 N. Main Street, Wichita, Sedgwick County, Kansas 67203.

16. In letters dated October 11, 2001 and October 12, 2001, the District Attorney, by and through Assistant Deputy District Attorney Frank White, advised Cambridge Credit of her opinion that K.S.A. § 21–4402 prohibits Cambridge Credit from providing debt adjusting services to Kansas residents in exchange for fees.

17. In an October 19, 2001 letter to the District Attorney, Cambridge Credit's counsel took the position that because Cambridge Credit executes its agreements in Massachusetts, does not transact business within Kansas, and has no contacts whatsoever with Kansas aside from the Website, Advertisements, and Magazines which may be received in Kansas as well as throughout the United States, Cambridge Credit is not prohibited by K.S.A. § 21–4402 from engaging in purely inter-

state commerce with respect to the Kansas residents with whom it contracts.

18. In a February 5, 2002 letter, the District Attorney requested that Cambridge Credit "agree to immediately cease accepting any money or other consideration from Kansas consumers for 'debt adjusting' as defined by K.S.A. § 21–4402 of the Kansas Criminal Code and agree to provide full refunds to any and all Kansas consumers who submit a request for a refund to this office or to [Cambridge Credit] directly."

## III. Standard

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgments as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all of the evidence in a light most favorable to the opposing party. *Jurasek v. Utah State Hosp.*, 158 F.3d 506, 510 (10th Cir. 1998). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Baker v. Board of Regents*, 991 F.2d 628, 630 (10th Cir.1993). The moving party need not disprove the nonmoving party's claim or defense; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir.1987).

The party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475

U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). The opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the opposing party must present significant admissible probative evidence supporting that party's allegations. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## IV. Analysis

The plaintiff argues that the defendant's actions are depriving it of its rights secured by the Commerce Clause. The plaintiff claims that the debt adjusting law is per se invalid because its application is discriminatory and extraterritorial. The plaintiff also argues that the debt adjusting law is indirectly invalid because the burdens it imposes on interstate business exceed any local benefit. The defendant disputes these claims.

 The Tenth Circuit discussed the Commerce Clause in *American Target Advertising, Inc. v. Giani*, 199 F.3d 1241, 1254 (10th Cir.2000), stating:

> The Commerce Clause not only empowers Congress to "regulate Commerce ... among the several States," U.S. Const. art I, § 8, cl. 3, but also 'denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce,' *Oregon Waste Sys. v. Dep't of Envtl., Quality*, 511 U.S. 93, 98, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994). This implied restraint upon the states is often referred to as the negative or "dormant" aspect of the Commerce Clause.

The first step in evaluating a commerce clause claim is to "determine whether the act in question 'regulates evenhandedly' among economic interests or instead 'discriminates against interstate commerce' either on its face or in practical effect." *Id.*

at 1241 (citations omitted). *Maine v. Taylor*, 477 U.S. 131, 138, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986), provides:

> Once a state law is shown to discriminate against interstate commerce 'either on its face or in practical effect,' the burden falls on the State to demonstrate both that the statute 'serves a legitimate local purpose,' and this purpose could not be served as well by available non-discriminatory means.

Utilizing this framework, the court finds that the debt adjusting law clearly regulates evenhandedly. The debt adjusting law does not distinguish between in-state and out-of-state companies. Its prohibitions apply equally to all individuals or entities, with the exception of those practicing law in this state, no matter where they are located. The parties stipulate that "competitors of Cambridge Credit doing business in Kansas, who are not attorneys, provide services similar to those provided by Cambridge Credit." Yet, the law on its face certainly does not provide for a protected class of in-state debt adjusting businesses nor is there any information before the court that the effects of the debt adjusting law lead to such a protected class. Based on the aforementioned, the court finds that the debt adjusting law is not *per se* invalid; it does not discriminate against interstate commerce on its face or in practical effect.

 If a statute regulates evenhandedly between in-state and out-of-state interests, then the court's evaluation moves to the balancing test outlined in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). The *Pike* court stated:

> Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on

such commerce is clearly excessive in relation to the putative local benefits. *Id.* "The party challenging a statute that regulates evenhandedly bears the burden of proving the statute's excess." 199 F.3d at 1254 (citation omitted).

Thus, the court must determine whether the debt adjusting law has a legitimate local public interest. In *Ferguson v. Skrupa,* 372 U.S. 726, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963), the Supreme Court examined the debt adjusting law and held that it was not a violation of the Due Process Clause of the Fourteenth Amendment.[1] In discussing the debt adjusting law, the *Ferguson* court stated:

> The business of debt adjusting gives rise to a relationship of trust in which the debt adjuster will, in a situation of insolvency, be marshaling assets in the manner of a proceeding in bankruptcy. The debt adjuster's client may need advice as to the legality of the various claims against him remedies existing under state laws governing debtor-creditor relationships, or provisions of the Bankruptcy Act—advice which a nonlawyer cannot lawfully give him.

*Id.* at 732, 83 S.Ct. 1028. The defendant argues that the Kansas legislature had such concerns about debt adjusting, when enacting the statute. Thus, the defendant argues that the law serves a legitimate local public interest. The court concurs with this argument and finds that the debt adjusting law has a legitimate local public interest.

Next, the court examines the extent of the debt adjusting law's burden on interstate commerce. "If a legitimate local purpose is found, then the question becomes one of degree." 397 U.S. at 142, 90 S.Ct. 844. The plaintiff argues that the debt adjusting law places a heavy burden

because it "forecloses all out-of-state debt adjusters, en masse, from offering their services for fees to Kansas residents." In making this argument, the plaintiff ignores the fact that the debt adjusting law also forecloses all in-state non-attorney debt adjusters from offering their services. "The 'incidental burdens' of the *Pike* inquiry 'are the burdens on interstate commerce that exceed the burdens on intrastate commerce.'" *V–1 Oil Co. v. Utah State Dept. of Public Safety,* 131 F.3d 1415, 1425 (10th Cir.1997) (quoting *New York State Trawlers Ass'n v. Jorling,* 16 F.3d 1303, 1308 (2d Cir.1994)). "For a state statute to run afoul of the *Pike* standard, the statute, at minimum, must impose a burden on interstate commerce that is qualitatively or quantitatively different from that imposed on intrastate commerce." *National Elec. Mfrs. Ass'n v. Sorrell,* 272 F.3d 104, 109 (2d Cir.2001) (citations omitted). *See also Georgia Manufactured Housing Ass'n, Inc. v. Spalding County, Ga.,* 148 F.3d 1304 (11th Cir.1998); *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981). The plaintiff fails to meet its obligation to show that the burdens placed on interstate commerce exceed those burdens on intrastate commerce. Again, although the parties stipulate that "competitors of Cambridge Credit doing business in Kansas, who are not attorneys, provide services similar to those provided by Cambridge Credit," the record does not show that the debt adjusting law permits such entities to operate. The record also does not show that the defendants have a practice of failing to enforce the debt adjusting law against such entities.

The plaintiff also argues that if the debt adjusting law is found to be constitutional,

---

1. The language of the debt adjusting law has been slightly amended since *Ferguson,* but these changes do not impact the public interest question.

then it will "offer the benefits of competition to Kansas citizens who are looking for expert debt adjusting assistance." However, "it may be true that the consuming public will be injured ... but ... that argument relates to the wisdom of the statute, not its burden on commerce." *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 128, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978) (quoted in *Ford Motor Co. v. Texas Dept. of Transp.*, 264 F.3d 493, 503 (5th Cir.2001)) (finding that under *Pike*, the district court correctly ignored the alleged benefits to consumers if the state law was invalidated).

■ The plaintiff also argues that if the debt adjusting law is found to be constitutional, then it will face a heavy burden. Namely, the plaintiff must refrain from dealing or contracting with any Kansas residents. The plaintiff states "there can be no greater burden than this putatively complete ban on Cambridge Credit doing business with Kansas residents." However, "the fact that a law may have 'devastating economic consequences' on a particular interstate firm is not sufficient to rise to a Commerce Clause burden." *Pharmaceutical Research and Mfrs. of America v. Concannon*, 249 F.3d 66, 84 (1st Cir.2001) (quoting *Instructional Systems, Inc. v. Computer Curriculum Corp.*, 35 F.3d 813, 827 (3d Cir.1994)) (additional citations omitted).

■ Based on the aforementioned, the court finds that the debt adjusting law is not indirectly invalid. The court finds that the burden imposed by the debt adjusting law on commerce is not clearly excessive in relation to its putative local benefits. In making this finding, the court notes "laws that impose the same burden on in-state and out-of-state business interest usually do not violate the Commerce Clause." 148 F.3d at 1308 (11th Cir.1998) (citation omitted). The court further notes "the Supreme Court has rarely invoked *Pike* bal-

ancing to invalidate state regulation under the Commerce Clause." *Southern Union Co. v. Missouri Public Service Com'n*, 289 F.3d 503, 509 (8th Cir.2002).

■ The plaintiff also argues that the debt adjusting law is invalid because its application to the plaintiff is extraterritorial. The "Commerce Clause ... precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State." *Healy v. The Beer Institute*, 491 U.S. 324, 336, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989) (quoting *Edgar v. MITE Corp.*, 457 U.S. 624, 642–43, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982)) (additional citations omitted). "[A] statute or regulation that violates the extraterritoriality ban is per se invalid." *Dean Foods Co. v. Brancel*, 187 F.3d 609 (7th Cir.1999).

The plaintiff, a Massachusetts corporation, argues that it executes the contracts in question in Massachusetts. Thus, the plaintiff contends that all of these contracts are subject to Massachusetts law. The plaintiff further argues that all its activities occur outside of Kansas, as its national advertising is not specifically directed at Kansas residents. In summary, the plaintiff contends that it is not engaged in debt adjusting in Kansas, so the Kansas debt adjusting law should not be applied to it.

In making its argument, the plaintiff relies on *Dean Foods Co. v. Brancel*, 187 F.3d at 609. In *Dean Foods Co.*, the court held that a Wisconsin statute could not be imposed on an Illinois milk producer who purchased milk in Illinois. *Id.* at 618. The *Dean Foods Co.* court concluded that although the milk had been transported from Wisconsin "the commerce at issue here occurred wholly outside of Wisconsin." *Id.* Accordingly, the Wisconsin statute violated extraterritoriality principles.

*Id.* However, the court remains unconvinced that *Dean Foods Co.* provides the proper analysis for this matter. Here, the transactions involved contracts formed between citizens of one state and a corporation located in another state. In other words, the transactions did not occur wholly outside of Kansas. The Third Circuit discussed similar transactions in *A.S. Goldmen & Co. v. New Jersey Bureau of Securities,* 163 F.3d 780, 787 (3rd Cir. 1999), stating:

> Contracts formed between citizens in different states implicate the regulatory interests of both states. Thus, when an offer is made in one state and accepted in another, we now recognize that elements of the transaction have occurred in each state, and that both states have an interest in regulating the terms and performance of the contract.

(citations omitted). Although *A.S. Goldmen & Co.* involved the purchase of securities, the court finds its extraterritoriality discussion applicable to this matter. The plaintiff's Kansas clients conduct all their business transactions with the plaintiff while remaining in the state of Kansas. These clients contract with, deliver funds to, and exchange information with the plaintiff without ever leaving Kansas. This case involves contracts formed between clients who are located in and remain in Kansas and a Massachusetts plaintiff. Thus, the state of Kansas has "an interest in regulating the terms and performance of the contract."

Based on the aforementioned, the court finds that the debt adjusting law is not in violation of the Commerce Clause because of extraterritoriality.

■ Finally, the plaintiff argues that it should not be subject to the debt adjusting law because it does not meet the legislative requirements for doing business in Kansas. Specifically, the plaintiff argues that it does not meet the definition of 'doing business' set forth in K.S.A. § 17–7303, which provides:

> Every foreign corporation that has an office or place of business within this state, or a distributing point herein, or that delivers its wares or products to resident agents in this state for sale, delivery or distribution, shall be held to be doing business in this state within the meaning of this act.

The parties have stipulated that the plaintiff has no physical presence in Kansas. Thus, the plaintiff argues that it does not meet the requirements set out in § 17–7303. However, the defendant argues that § 17–7303 is limited by the its language, which reads "within the meaning of this act." The defendant argues that this language limits this definition of 'doing business' to the Foreign Corporations provisions found in K.S.A. §§ 17–7301 through 17–7308, which address when a foreign corporation must file an application to engage in business with the Kansas Secretary of State, what the filing requires, and other similar matters. The defendant claims that these matters are separate from the debt adjusting law which is set out in the state's criminal statutes. The court concurs with the defendant's argument and finds that the definition set out in § 17–7303 does not limit the state of Kansas' jurisdiction to enforce its criminal statutes.

IT IS THEREFORE ORDERED this 25th day of September, 2003 that the court grants the defendant's motion for summary judgment (Dkt. No. 21). Accordingly, this declaratory judgment action is dismissed.